## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JHONNY ERIK ORDONEZ,

        Plaintiffs,

v.

LEXISNEXIS RISK SOLUTIONS INC.,

        Defendant.

Case No.: 6:24-cv-01488

**JURY TRIAL DEMANDED**

## COMPLAINT

Jhonny Erik Ordonez ("Plaintiff" or "Mr. Ordonez") brings this action on an individual basis, against LexisNexis Risk Solutions Inc. ("LNRS" or "Defendant") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, insurers, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, insurance, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

6.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies."  *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.      Congress made the following findings when it enacted the FCRA in 1970:

   (a)   The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
   (b)   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
   (c)   Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
   (d)   There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the

confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C.   §   1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years.  *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     Notwithstanding Defendant's notice , mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

20.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for

credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

21.     CRAs, including Defendant, have been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

22.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

23.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

24.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

25.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom.  Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting

that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

28.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

29.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

30.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

31.    Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

32.    Further, Plaintiff's claims also arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant permitted the impermissible access

to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

33.    Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

34.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

35.     Jhonny Erik Ordonez ("Plaintiff" or "Mr. Ordonez") is a natural person residing in Oviedo, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

36.     Defendant LexisNexis Risk Solutions Inc. ("LNRS" or "Defendant") is a Delaware corporation doing business throughout the United States, including the State of Florida and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, CT Corporation System, located at 1200 South Pine Island Road, Plantation, FL 33324.

37.     LNRS is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LNRS is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

38.     The information LNRS collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of millions of Americans.  LNRS also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

39.     LNRS collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether LNRS collects and maintains information about them.  Not only that, but consumers cannot remove information that LNRS collects and maintains about them from the LNRS database. Further, LNRS sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that LNRS sold.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

41.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

42.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

43.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

44.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

45.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

*Jhonny Erik Ordonez v. LexisNexis Risk Solutions Inc.*
COMPLAINT

46.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT'S PROCESSING OF CREDIT INFORMATION

47.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

48.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

49.     Defendant collects information from thousands of furnishers.

50.     The process by which Defendant receives, sorts, and stores information is largely electronic.

51.     Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

52.     Defendant takes credit information reported by furnishers and creates consumer credit files.

53.     Defendant maintains credit files on millions of consumers.

54.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANT'S MIXED FILE PROBLEM

55.    Defendant knows that different consumers have similar names.

56.    Defendant knows that different consumers can have similar Social Security numbers.

57.    Defendant knows that different consumers with similar names can also have similar Social Security numbers.

58.    Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

59.    Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

60.    Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

61.    From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer;

resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

62.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

63.     Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

64.     A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

65.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

66.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

67.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

68.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

69.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff Attempts to Renew his Insurance with Progressive at a Discounted Rate

70.    On or about November 14, 2023, Plaintiff was interested in renewing his car insurance with Progressive and applied for a renewal. A Progressive representative informed Plaintiff that, due to his great driving history, Plaintiff would qualify for a significant discount to his insurance rate.

71.    For Progressive to make a determination on Plaintiff's application to renew his car insurance, it would need to obtain copies of his consumer files. Plaintiff provided Progressive with his personal identification information, and authorized it to obtain copies of his consumer files.

72.     On or about November 14, 2023, Defendant sold a consumer report about Plaintiff to Progressive in response to Plaintiff's application to renew his car insurance at the discounted rate.

## Progressive Informs Plaintiff that he Does Not Qualify
## for the Discounted Rate

73.     Shortly after receiving the consumer report concerning Plaintiff from Defendant, a Progressive representative informed Plaintiff that he would not qualify for the discount because of an insurance claim incident that happened in New York.

74.     Defendant's reporting was grossly inaccurate because Plaintiff never owned or lease a car while he lived in New York.

75.     Plaintiff was shocked and dismayed at the discounted rate denial because Plaintiff had been diligently working towards being a responsible driver and had been very careful to avoid accidents. Plaintiff was even more confused since he only obtained a car, and therefore car insurance, when he moved to Florida.

76.     Accordingly, Plaintiff called Progressive and spoke to another representative. The representative brought up the New York claim and Plaintiff explained that this claim did not belong to him. The representative responded that Plaintiff needed to contact Defendant, the company that provided this information to them, to correct the matter.

77.     Thereafter, in or around the period of late-2023 through the beginning of 2024, Plaintiff requested his consumer report twice from Defendant. However,

Defendant responded to each of these requests with a letter stating it was unable to verify Plaintiff's Identity. Plaintiff also attempted to Defendant on numerous occasions without any success.

78.    It was inaccurate for Defendant to publish information to a third party indicating that Plaintiff had an insurance claim incident arising out of an accident in New York.

79.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Plaintiff Applied for an Insurance Quote with Geico But was Denied the Best Quote Due to Defendant's Inaccurate Reporting

80.    In or around March 1, 2024, Plaintiff received communication from Credit Karma that recommended that he apply with Geico Insurance because he may qualify for a better insurance rate due to his good credit.

81.    Thus, in or around March 1, 2024, Plaintiff applied for a quote with Geico.

82.    For Geico to make a determination on Plaintiff's application, it would need to obtain copies of his consumer files.  Plaintiff provided Geico with his personal identification information, including his Social Security number, and authorized it to obtain copies of his consumer files.

83.    On or about March 1, 2024, Defendant sold a consumer report about Plaintiff to Geico in response to Plaintiff's application.

84.    On or about March 1, 2024, Plaintiff received a communication from Geico notifying him that he was not given their best quote based on the consumer report it received from Defendant.

85.    Plaintiff immediately tried to obtain a copy of the consumer report Defendant sold to Geico. However, on or about March 8, 2024, Plaintiff received a letter from Defendant stating it was unable to process his request because it was unable to verify his identity.

**Plaintiff Finances a Home and Applies for Swyfft Homeowners Insurance**

86.    In or around April 2024, Plaintiff was in contract to purchase a home and applied for financing with DartBank.

87.    As part of the financing requirement with DartBank, Plaintiff needed to obtain homeowners insurance.

88.    Therefore, in or around April 2024, a representative of DartBank, on behalf of Plaintiff, applied for homeowners' insurance with Swyfft LLC ("Swyfft").

89.    For Swyfft to make a determination on Plaintiff's application for homeowners' insurance, it would need to obtain copies of his consumer files. Plaintiff, through DartBank, provided Swyfft with his personal identification

information, including his Social Security Number, and authorized it to obtain copies of his consumer files.

90.    In or around April 2024, Defendant sold a consumer report about Plaintiff to Swyfft in response to Plaintiff's application.

91.    In or around April 2024, Plaintiff was approved by Swyfft for the homeowner's insurance he needed to purchase his home at a higher than normal rate.

**Geico Motivates Plaintiff to Apply for Another Quote in June 2024**

92.    In or around June 2024, Plaintiff received an email from Geico stating that he may qualify for a discount due to his excellent credit.

93.    Therefore, no or around June 22, 2024, Plaintiff once again applied for a quote with Geico.

94.    For Geico to make a determination on Plaintiff's application, it would need to obtain copies of his consumer files.  Plaintiff provided Geico with his personal identification information, including his Social Security number, and authorized it to obtain copies of her consumer files.

95.    On or about June 22, 2024, Defendant sold a consumer report about Plaintiff to Geico in response to Plaintiff's application.

96.    On or about June 22, 2024, Plaintiff received a communication from Geico once again notifying him that he was not given their best quote based on the consumer report it received from Defendant.

97.     Plaintiff was confused, worried, and shocked at the repeated denials from Geico to qualify Plaintiff for the discount insurance rate, especially since Plaintiff believed he had excellent credit.

## Plaintiff's Mixed Credit File as of July 2024

98.     Shocked, worried, and confused, Plaintiff immediately requested a copy of her credit file from Defendant.

99.     Finally, on or about July 12, 2024, Plaintiff secured a copy of his credit file/report from Defendant.

100.    Upon reviewing the contents of the July 12, 2024, credit file/report, Plaintiff was bewildered by the appearance of several pieces of information that did not belong to Plaintiff at all.

101.    Specifically, Defendant was reporting the following insurance policy and insurance claim records which belong to Plaintiff's twin brother, and not Plaintiff:

     (a)    Record 1 - State Farm Insurance Policy
             Policy Number: 321142xxxx
             Inception Date: April 2012
             Status: Active
             Driver's License Number: XXXXX1936, Plaintiff's brother's Driver's License Number
             Additional Insured: Cecila D Ortiz Proano, Plaintiff's brother's wife

     (b)    Record 2 – Automobile Insurance Claim
             Claim Number: 3253K480B230722
             Claim Amount(s): $2,794.00 and $1,000.00 rent reimbursement

Claim Type: Collision
Driver's License Number: XXXXX1936, Plaintiff's brother's
Driver's License Number
Date of Claim: July 22, 2023

(c)     Record 3 – Property Insurance Claim
        Claim Number:327172L47082518
        Secondary Policyholder: Cecila D Ortiz Proano, Plaintiff's
        brother's wife
        Date of Claim: August 25, 2018

102.   Further, Defendant was reporting a Property Deed and Assessor Record

for the property located at ██████████, Maspeth, NY 11378, which did not

belong to Plaintiff, and a Department of Driver Services Records showing an Indiana

license that does not belong to Plaintiff either.

103.   Further, Defendant was reporting the various addresses, phone number,

and emails, which did not belong to Plaintiff.

104.   Further, Defendant was reporting a social security number ("SSN")

variation ending in 6526, which is completely different from Plaintiff's SSN, as well

as name variations, including Jhonny G. Ordonez and Mr. Jhonny G. Ordonez,

which does not accurately reflect Plaintiff's name, but rather reflects the name of

Plaintiff's twin brother.

105.   By reporting the aforementioned records and other personal

information in the credit file presumably about Plaintiff, despite the fact that the

records and information do not belong to Plaintiff, Defendant failed to follow

reasonable procedures to assure the maximum possible accuracy of the information

contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

106.   Further, Defendant was also reporting the following account inquiries, with whom Plaintiff did not have an account relationship:

      (a)   February 03, 2024 – Demand Deposit from Primis

      (b)   September 24, 2023 – NetCredit/Republic Bank &Trust

      (c)   May 14, 2023 – Discovery Financial Services

107.   Plaintiff did not apply for credit with any of the aforementioned entities and did not have a relationship with any of the aforementioned entities.  Defendant did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

108.   Upon information and belief, all three of the above-referenced inquiries were initiated by credit applications submitted by an unrelated consumer.

109.   As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Defendant on the above-referenced dates in 2021, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Defendant, Defendant disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

110.    In addition, the July 12, 2024, credit/consumer report included "CLUE"
notes which demonstrate that Plaintiff's brother's auto insurance claim was sent to
the following companies:

(a) Progressive on November 14, 2023;

(b) Geico on March 1, 2024; and

(c) Geico on June 22, 2024.

111.    Upon information and belief, Plaintiff was denied discounted rates for
his automobile insurance applications as a result of Defendant inaccurately reporting
Plaintiff's brother's auto insurance claim on the consumer reports it sold to Geico
and Progressive.

112.    The CLUE notes also demonstrated that Defendant sold Swyfft a
consumer report in response to Plaintiff's homeowner's insurance application
wherein Defendant inaccurately included the following information which, upon
information and belief, belong to Plaintiff's brother:

(a) Name – Ordonez, Jhonny G;

(b) Address – ████████, Maspeth, NY

(c) Former Address – ████████ Maspeth, NY

(d) Grand Total Owed – $320,200.00

(e) Inquiries:

(i) NCCINC/LEXUS OF QUEENS on February 17, 2023; and

(ii) TOYOTA MOTOR CREDIT CO on February 17, 2023

(f) Credit/Consumer Accounts:

(i) Bank of America account opened June 2022, with partial Account No. 123BC0206;

(ii) Bank of America account account opened November 2004, with partial Account No. 121BC3727;

(iii) Comenity Capital/Ikeapc account opened February 2019, with partial Account No. 194HF7623;

(iv) Barclays Bank Delaware account opened February 2018, with partial Account No. 122BC3850;

(v) THD/CBNA account opened January 2010, with partial Account No. 317ZR8962;

(vi) MACYS/CBNA account opened November 2017, with partial Account No. 136DZ2830;

(vii) JPMCB Card account opened November 2004, with partial Account No. 318BC2310;

(viii) Syncb/Lowes account opened February 2010, with partial Account No. 160LZ7340;

(ix) Syncb/Amazon account opened August 2011, with partial Account No. 100DV4694;

(x) AMEX/CBNA account opened November 2008, with partial Account No. 191BC725;

(xi)    MACYS/CBNA account opened November 2008, with partial Account No. 136DZ2830;

(xii)    SYNCB/PPC account opened April 2012, with partial Account No. 284BC8440;

(xiii)    SYNCB/AMAZON account opened July 2019, with partial Account No. 100DV4694;

(xiv)    Apple Card/GS Bank USA opened December 2019, with partial Account No. 179BB5380;

(xv)    US Bank account opened July 2013, with partial Account No. 314BB3770;

(xvi)    KOHLS/CAPONE account opened February 2013, with partial Account No. 192DC6781

(xvii)    Bank of America account opened June 2013, with partial Account No. 123BC0206;

(xviii)    AMEX/CBNA account opened December 2022, with partial Account No. 191BC7250;

(xix)    Toyota Motor Credit account opened August 2019, with partial Account No. 160FA2300;

(xx)     TD Bank NA/ICON account opened November 2020, with partial Account No. 196BB8924;

(xxi)    Wells Fargo HM Mortgage account opened May 2016, with partial Account No. 199FM5515;

(xxii)   Toyota Motor Credit account opened September 2017, with partial Account No. 160FA2300;

(xxiii)  Toyota Motor Credit Co account opened February 2015, with partial Account No. 156FP7215;

(xxiv)   Municipal Credit Union account opened May 2021, with partial Account No. 172FC0230;

(xxv)    Valley National Bank account opened December 2020, with partial Account No. 111BB3260; and

(xxvi)   Toyota Motor Credit opened February 2023, with partial Account No. 160FA2300.

113.   Upon information and belief, Plaintiff was approved for Swyfft homeowner's insurance for less favorable terms than he would have been if not for Defendant inaccurately reporting Plaintiff's brother's credit/consumer accounts, along with other erroneously mixed information, on the consumer report it sold to Swyfft.

114.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

115.   Upon information and belief, because Defendant continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

116.   As a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain credit.

117.   At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

118.   At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

119.   Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

120.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of  discounted insurance rate denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant LNRS)**

121.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

122.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **_maximum possible accuracy_** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

123.   On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

124.   Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

125.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

126.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of

credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of discounted insurance rate denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

127.   Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

128.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681b(a)
### Furnishing a Credit Report Without a Permissible Purpose
### (Second Claim for Relief Against Defendant LNRS)

129.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

*Jhonny Erik Ordonez v. LexisNexis Risk Solutions Inc.*
COMPLAINT

130.   This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

131.   Plaintiff is a "consumer" as defined by the FCRA.

132.   Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

133.   The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

134.   On multiple occasions, Defendant furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

135.   Defendant violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

136.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private

financial information confidential; the loss of his right to information about who was viewing her private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of discounted insurance rate denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

137.    Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

138.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

//

*Jhonny Erik Ordonez v. LexisNexis Risk Solutions Inc.*
COMPLAINT

RESPECTFULLY SUBMITTED this 14th day of August 2024,

### CONSUMER ATTORNEYS

*/s/ David Pinkhasov*
David Pinkhasov, FL No. 1040933
72-47 139th street
Flushing, NY 11367
T: (718) 701-4605
E: dpinkhasov@consumerattorneys.com

*/s/ Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (718) 715-1750
E: ctillman@consumerattorneys.com

*Attorneys for Plaintiffs,*
*Jhonny Erik Ordonez*

*Jhonny Erik Ordonez v. LexisNexis Risk Solutions Inc.*
COMPLAINT